## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SANUM INVESTMENT LIMITED and
LAO HOLDINGS, N.V.,

        Plaintiffs,

  v.

SAN MARCO CAPITAL PARTNERS, LLC
and KELLY GASS,

        Defendants.

CIVIL ACTION NO.: _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs SANUM INVESTMENT LIMITED ("Sanum") and LAO HOLDINGS, N.V. ("Lao Holdings") (together, "Plaintiffs") file this Complaint against Defendants SAN MARCO CAPITAL PARTNERS, LLC ("San Marco") and Kelly Gass ("Gass") (together, "Defendants") and respectfully allege, on knowledge as to themselves and their own acts and on information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. Defendant Kelly Gass and her company San Marco Capital Partners, LLC have been paid nearly $2 million of Plaintiffs' money to faithfully serve as Plaintiffs' fiduciaries in managing a casino and other gaming operations that Gass purported to know how to run and sell. Instead, Gass has served only Plaintiffs' adversary, the Government of the Lao People's Democratic Republic ("Laos" or the "GOL"), a corrupt and totalitarian regime that admittedly expropriated Plaintiffs' assets in Laos with Defendants' cooperation and assistance. The GOL is minority shareholder in the Savan Vegas Hotel & Casino Company, Ltd. ("Savan Vegas"), the entity that owned the assets with which Gass and San Marco were entrusted. Under Gass's management, the financial reporting regarding Savan Vegas is opaque at best; the only thing that

is clear is, while there are millions of dollars of unexplained disbursements, Sanum as the 80% shareholder receives nothing.

2.      In June 2014, Plaintiffs and the GOL entered into a Deed of Settlement (the "Deed") and a Side Letter to resolve arbitrations (the "BIT Arbitrations") that Plaintiffs had brought alleging that the GOL had violated its obligations under two bilateral investment treaties with regard to various gaming and other investments in Laos.  These assets included the Savan Vegas Hotel & Casino (the "Casino") and two slot clubs (the "Slot Clubs") (together, the "Gaming Assets").   A key provision of the Deed was that the Gaming Assets would be sold to a third-party "on a basis that will maximize Sale proceeds," thereby allowing Plaintiffs to monetize their significant investment without the risk of obtaining and enforcing a judgment against Laos.

3.      When the GOL failed to live up to its obligations under the Deed, Plaintiffs sought, in arbitration before the Singapore International Arbitration Centre (the "SIAC Arbitration"), to return Savan Vegas and the Casino to Sanum's control, or in the alternative implement Section 12 of the Deed, which provides that the parties shall jointly have the right to appoint a qualified neutral gaming operator to take over, manage, and sell the Gaming Assets in certain circumstances.  It was only then that the GOL disclosed that it had already unilaterally hired Gass and San Marco to do so, despite the fact that neither had prior experience in Laos, neither had ever served as a manager or operator of a casino or slot clubs, and neither had ever been responsible for the marketing and sale of such assets.

4.      The contract between the GOL and San Marco/Gass (the "Contract") expressly states that, in accordance with the Deed, Gass and "San Marco will . . . perform its Services for the mutual benefit and best interest of all stakeholders in the Gaming Assets," including Plaintiffs, and further acknowledges that "with respect to the sale and the price and terms

thereof, [Laos] recognizes that San Marco has a fiduciary duty to both [Laos] and the [Plaintiffs], as stated in the Deed." As demonstrated by the outrageously excessive compensation paid to Gass and San Marco – $1.8 million per year and 6% of the sale price of the Gaming Assets reasonably expected by Sanum to be in the hundreds of millions of dollars if the terms of the Settlement had been respected – it is now obvious that Gass was bought by the GOL to act solely in its interest. Worse, the GOL bought Gass with Plaintiffs' money, seizing Sanum's assets in Laos, and allowing Gass to pay herself from the income of the Casino, owned 80% by Sanum. When compensation is so far above market rates, the only conclusion in these circumstances is that it is a bribe (in an amount sufficient to enable kickbacks) to Gass to ensure that the Gaming Assets are not sold in a manner that "maximizes the sale proceeds," but instead are sold at the cheapest price possible to local cronies or their proxies. If Gass were really going to sell the Gaming Assets for their true value, she would have been paid the 1-2% that a far more qualified institutional investment banker would have charged – and in fact offered to charge.

5. Gass and San Marco have not disappointed their GOL benefactors. Since being put in charge of the Gaming Assets and their sale she and San Marco have repeatedly and maliciously breached their fiduciary obligations to Plaintiffs by acting, or deliberately not acting, in a manner intended to benefit the GOL at Plaintiffs' expense. Among the most notorious examples of such willful wrongdoing are Defendants': (i) refusal to communicate with Plaintiffs regarding the management and operation of the Gaming Assets, or to respond to Plaintiffs' repeated requests for regular and ongoing financial information; (ii) refusal to pay Plaintiffs their proportionate share of gaming revenues, or to account for such revenues; (iii) failure to advise Plaintiffs about efforts to market and sell the Gaming Assets at a maximum price, or allow Plaintiffs' input into those efforts, and instead allowing the GOL to direct the sale for its own

benefit; and (iv) seizure of all funds in Plaintiffs' banking accounts in Laos and diversion to Gass's personal control – or wrongful ceding of control to the GOL or its counsel.

6.      Such wrongdoing has caused direct financial injury to Plaintiffs and significantly reduced the potential sale price of the Gaming Assets.  Accordingly, Plaintiffs now bring these claims for the purpose of pursuing and enforcing their legal rights.

## PARTIES

7.      Sanum Investment Limited is a business entity organized under the laws of the Macau Special Administrative Region, People's Republic of China, and its principal place of business is c/o Jorge Menezes ARB Legal - Advogados/Lawyers, Av. da Amizade, 555, Edf. Landmark, 13 (1308), MACAU.

8.      Lao Holdings, N.V. is a business entity organized under the laws of the Netherlands, and its principal place of business is located at L. G. Smith Boulevard 62, Miramar Building, Suite 304, Oranjestad, Aruba.

9.      San Marco Capital Partners, LLC is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 4575 Dean Martin Drive, Suite 1701, Las Vegas, Nevada 89103.  Its sole member and manager is Kelly Gass, who is a citizen of the State of Florida.  San Marco may be served with process through its registered agent Agents and Corporations, Inc., 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware  19801.

10.     Kelly Gass is a citizen of the State of Florida, currently residing in Laos, who may be served by any means permissible under FED. R. CIV. P. 4.

4

## JURISDICTION

11.     The Court has original jurisdiction over Plaintiffs' claim pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the matters in controversy exceed the sum of $75,000.

12.     The Court has personal jurisdiction over San Marco because it is a limited liability company established under the laws of Delaware.  The Court has personal jurisdiction over Gass pursuant to 6 Del. C. 18.09 because she is a manager of San Marco and this action involves and relates to the business of San Marco.

## VENUE

13.     Venue for this action is proper under 28 U.S.C. 1391(b)(3) because both Defendants are subject to this Court's personal jurisdiction with respect to the matters stated herein this Complaint.

## FACTUAL ALLEGATIONS

### A.     Plaintiffs' Investments In Laos And Settlement Of The BIT Arbitrations

14.     In 2007, Plaintiffs commenced a series of investments in gaming and other industries in Laos.  Over the course of the following five years they invested more than $85 million, and trained and employed thousands of Lao citizens.  These investments included the Gaming Assets.  Plaintiffs are 80% owners of Savan Vegas and the Casino, and 60% owners of the Slot Clubs.  The GOL owns the remaining 20% of the Casino and a local Lao company, ST Group Co., Ltd. ("ST Group"), owns 40% of the Slot Clubs.

15.     In 2012, Plaintiffs separately filed investment treaty arbitrations against Laos.   In those arbitrations, Plaintiffs alleged that the GOL had expropriated their property and otherwise violated Plaintiffs' treaty rights with regard to their investments in the Gaming Assets and their other investments in Laos.

40000/0599-13083688v3

16.     On June 15, 2014, the GOL and Plaintiffs settled the BIT Arbitrations by executing the Deed.   The parties executed a Side Letter on June 18, 2014, to resolve certain disputes regarding the drafting of the Deed, and agreed that the Deed is to be construed with the Side Letter (thus references to the "Deed" include the Side Letter).

**B.      Relevant Terms Of The Deed Of Settlement**

17.     The Deed is based on a fundamental bargain struck by Plaintiffs and the GOL: Plaintiffs would sell the Gaming Assets, and all parties would abide by their obligations under the Settlement, which would allow the Gaming Assets to be sold for maximum sale proceeds. Section 13 of the Deed explicitly requires the parties to "maximize sale proceeds" from the Gaming Assets.  Indeed, Plaintiffs were led to consider the settlement of the BIT Arbitrations because they had received an offer to purchase the Casino for in excess of $200 million if certain conditions were met.  Thus, the Deed was entered into to insure the GOL's cooperation in providing the protections (monopoly, airport rights, extra land, favorable project development agreement, favorable flat (not *ad valorem* tax) that would enable Plaintiffs to monetize their remaining assets in Laos through a sale and receive the proceeds safely outside of the country from an escrow funded by the third-party purchaser.  The risks to Plaintiffs of establishing Laos's liability through the BIT arbitrations and enforcing and collecting on favorable awards were thus obviated.

18.     To that end, in the Deed the Parties agreed to sell the Gaming Assets to a qualified third-party by the Sale Deadline, defined as not later than ten (10) months after the Settlement was signed, subject to certain extensions, with Plaintiffs remaining as managers and operators through that time.   Should the assets not be sold by the Sale Deadline, the Deed specifies that the parties must jointly consult to appoint a qualified neutral gaming operator to take over, manage, and sell the Gaming Assets.  The Deed further specifies that this operator

6

"shall have a fiduciary duty" to Sanum and Lao Holding "as interested parties in the Gaming Assets."

19.     In addition, the Deed: (i) provides that the gaming licenses and the PDA, dated August 10, 2007, between the parties – which governs the Casino – would be treated as being restated and effective for fifty more years; (ii) states that all taxes on the Gaming Assets would be forgiven up to July 1, 2014; and (iii) lays out a procedure whereby the parties' representatives are to jointly form a Flat Tax Committee that is to set a new flat tax – *i.e.* not an ad valorem tax rate – on the Gaming Assets, and fixes the amount at which such flat tax would increase every five years.

20.     Section 42 of the Deed states that it "shall be governed and construed solely in accordance with the laws of New York."

**C.    The SIAC Arbitration To Enforce The Deed**

21.     No sooner than the Deed was executed, Lao officials appeared at a signing ceremony with private parties, announcing the development of a casino (Savan Paradize) literally across the road from the Casino.  This would have violated the Deed's promise of a fifty-year continuation of Savan Vegas' three province monopoly and utterly destroyed the chance of a favorable sale.  Plaintiffs promptly brought a proceeding (the "Material Breach Application"), established in the Deed itself, to reinstate the settled BIT Arbitrations on account of a material breach by the GOL.  During the pendency of the Material Breach Application, all deadlines in the Deed were stayed.  Ultimately, the BIT Tribunals did not reinstate the BIT Arbitrations, finding insufficient evidence that the GOL itself (as opposed to third parties) authorized the development of a casino in the Savan Paridize development.

22.      In August 2014 the GOL began the SIAC Arbitration against Sanum and Lao Holdings, alleging that Plaintiffs had failed to perform various obligations under the Deed of

Settlement that were stayed by the Material Breach Application. Sanum and Lao Holdings, in pleadings amended in May 2015, denied these allegations and asserted counterclaims against the GOL for fraudulent inducement and breach of contract. They also sought certain provisional measures against the GOL aimed at protecting their rights during pendency of the arbitration.

23.     On June 30, 2015 – and as further discussed below – the SIAC arbitration panel entered an Order on Plaintiffs' amended application for provisional measures, denying the request in part but granting Plaintiffs' request for financial information about the operation of the Gaming Assets, as well as information concerning Defendants' efforts to sell the assets. A hearing on the merits of the parties' claims and counterclaims is set for November 2016.

**D.      San Marco's And Gass's Compensation Under The Contract Is So Excessive That It Evidences Bribery, Kickbacks And Illegal Conduct**

24.     On April 16, 2015, the GOL entered into a "Management and Sales and Marketing Contract" with San Marco. The agreement was signed by Gass as the "President" of San Marco.

25.     The GOL's intention in unilaterally hiring Defendants is clear – so that it can control San Marco and Gass and ensure that the management, operation, marketing and sale of the Gaming Assets are conducted in a manner that benefits the GOL to Plaintiffs' detriment. Specifically, the GOL wants to ensure that – contrary to the Deed's mandate that the Gaming Assets be sold in a manner that "maximizes the sale proceeds" for all stakeholders, including Plaintiffs – the assets are instead sold at the cheapest price possible. It is rumored that the sale will be to a favored insider who, unlike Plaintiff, will be willing to pay off whoever it is necessary to pay to stay in business in Laos. As shown below, Defendants' compensation is so grossly excessive as to evidence bribery, kickbacks and payment for illegal conduct.

40000/0599-13083688v3

26.     In the Settlement Deed Sanum agreed that a jointly hired professional gaming management company (with its whole team of experienced professionals) would be retained to manage and then sell the Gaming Assets.   Instead, the GOL unilaterally hired San Marco, consisting solely of the unqualified Gass, to be paid $1.8 million per year in "Gaming Asset Management Fees," at Plaintiffs' expense (with additional staff being separately paid by Savan Vegas), and 6% of the gross purchase price of the Gaming Assets, which should have been in the hundreds of millions of dollars, as a "Sales and Marketing Success Fee."   The Contract also provides that San Marco's travel expenses, housing and office expenses, and "other reasonable and customary expenses . . . will be attributed to and paid for from the Gaming Assets." – thereby reducing potential proceeds.

27.     Prior to April 2015, it does not appear that Gass or San Marco had any experience managing or operating either a casino or slot club.   Moreover, neither had been responsible for the marketing or sale of such assets.   They had zero experience with regard to gaming interests in Laos.

28.     In comparison, in 2014 *experienced* investment bankers working on mergers and acquisitions in the $200 million to $500 million range were paid an average of 1.2% to 2.5% in fees.   Moreover, under Plaintiffs' period of control the prior general manager of the Casino – a much older professional with Asia gaming experience – was paid $8000 a month with some success-based incentives, as opposed to the $150,000 a month being paid to Gass.

**E.    The Contract Imposes Fiduciary Duties On San Marco And Gass**

29.     By its express terms the Contract unambiguously provides clear and direct benefits to Sanum and Lao Holdings, and imposes on San Marco and Gass fiduciary duties owed to Plaintiffs.   As a Certified Public Accountant licensed to practice in both Delaware and Nevada, Gass knows that fiduciaries must act in the best interests of their principals.

40000/0599-13083688v3

30.     In its opening recital the Contract states that it is in "Connection with the Services Related to the Management, Marketing and Sale of the Savan Vegas Casino, the Lao Bao Slot Club and the Savannakhet Ferry Terminal Slot Club (collectively, the 'Gaming Assets') *pursuant to Sections 12, 13, and 16 of the Deed of Settlement* and the terms of this Agreement." (emphasis added).  The Contract's stated purpose is to "hav[e] San Marco . . . manage, control, market and sell the Gaming Assets *as contemplated by Sections 12, 13 and 16 of the Deed*," and it is to remain in effect until such time as the sale of the assets is completed. (emphasis added).  Sanum and Lao Holdings are specifically defined in the Contract as the "Investors."

31.     The Contract also expressly provides, at Section 11, that, "San Marco will, through the exercise of reasonable business judgment, perform its Services for the *mutual benefit and best interest* of all stakeholders in the Gaming Assets, including the GOL and the *Investors*." (emphasis added).  It further acknowledges that San Marco's ability to perform under the Contract is "dependent upon receiving the substantial and effective cooperation from . . . the Investors," thereby requiring San Marco to accept advice and cooperation from Investors, not ignore them.  It further states that, "with respect to the sale and the price and terms thereof, [Laos] recognizes that *San Marco has fiduciary duty* to both the Government and the *Investors*, as stated in the Deed." (emphasis added).

32.     In addition, Section 8 of the Contract states that the GOL "recognizes that San Marco is accepting the assignment to manage, control and sell the Gaming Assets in a legal environment with significant risk of claims that might be brought by the Investors . . . against San Marco."  The GOL thus agrees to indemnify San Marco and Gass for any liability arising out of such claims, including all costs and attorneys' fees.

33.    In its Order granting in part Plaintiffs' request for the provisional measures, the SIAC arbitration panel agreed that San Marco owed fiduciary obligations to Plaintiffs pursuant to the Deed and the Contract.  It first noted that the "Deed's fundamental purpose" is to sell the Gaming Assets and split the proceeds according to the parties' respective ownership interests.  It then specifically found that "Laos, and its agents operating the casino, including of course, Ms. Kelly Gass, have a fiduciary duty to [Plaintiffs] in managing the casino and making efforts to obtain the maximum price at a sale."  To that end, "Laos and the gaming operatives it has employed have a fiduciary duty to [Plaintiffs] and must in good faith consider any suggestions and input" of Plaintiffs."    The panel, therefore, ordered the GOL to: (i) provide Sanum with "regular and ongoing information pertaining to the marketing and other efforts being made to sell the casino;" (ii) provide Sanum with "regular and ongoing information pertaining to the marketing and other efforts being made to sell the casino;" and (iii) to "retain a broker to market and sell Savan Vegas and to assist the broker with the marketing of the property and onsite visits of potential buyers."

34.    Section 11(i) of the Contract states that it "will be governed by and construed solely in accordance with the laws of the State of New York, United States of America, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction."

**F.    San Marco And Gass Deliberately Breach Their Fiduciary And Contractual Duties To Plaintiffs In Order To Aid The GOL's Theft Of Plaintiffs' Property**

35.    San and Marco knowingly breached their contractual and fiduciary obligations to Plaintiffs the minute they agreed to manage, operate, market, and sell the Gaming Assets.  The Contract specifically notes that San Marco is being employed – at Plaintiffs' expense – for the purposes of fulfilling the GOL's obligation under, Sections 12, 13 and 16 of the Deed.  San

11

Marco and Gass are, therefore, presumed to have read and understood the Deed prior to executing the Contract. Section 12 of the Deed, however, expressly states that right to appoint San Marco was to be exercised by Plaintiffs *and* the GOL – not either party unilaterally. Thus, Gass and San Marco were fully aware when they executed the Contract that it was in breach of Deed, and thus their concomitant fiduciary obligations to act in Plaintiffs' benefit and best interest.

36.     Moreover, from the outset of their appointment as manager and operator of the Gaming Assets, Gass and San Marco stubbornly refused to *in any way* act for the benefit or best interest of Plaintiffs, or to *in any way*, fulfill its fiduciary duties to Plaintiffs. Instead, they have deliberately, willfully and maliciously chosen to act solely in the interest of the GOL to the detriment of Plaintiffs' rights under the Deed.

37.     Indeed, Gass made this intention clear to Plaintiffs in the first 48 hours of her tenure as manager and operator of the Gaming Assets. As Savan Vegas CFO Crawford was going over the operations' cash-on-hand, Gass stated that it was not enough. When Crawford pointed out that the funds were more than sufficient to cover payroll and other operating expenses, Gass responded that she had significant legal bills to pay and the funds available would not cover them. Only a few days later, the GOL falsely declared to the SIAC Arbitration Panel that Defendants had borrowed money to make payroll. In short, one of Gass's first acts as Plaintiffs' newly-appointed fiduciary was to divert funds from the Gaming Assets – majority-owned by Plaintiffs – to pay the legal fees of Plaintiffs' litigation adversaries and then encumber the assets with debt to cover the resulting operating shortfall.

1.      **Deliberate Failure to Communicate with Plaintiffs**

38.     After taking over the management, operation and sale of the Gaming Assets – all of which are majority-owned by Plaintiffs – San Marco and Gass stubbornly refused to have any

12

direct substantive communication with Plaintiffs.  For example, Gass refused to personally meet with Plaintiffs' representatives in Laos.  In addition, beginning in June 2015 Plaintiffs sent dozens of written communications, by email and letter, to Gass and San Marco: (i) requesting that they provide the basic financial and operational information regarding the Gaming Assets; (ii) requesting information regarding the status of San Marco's and Gass's efforts to sell the Gaming Assets at the maximum price; (iii) requesting information regarding the status of the gaming operations and San Marco's and Gass's efforts to attract new business; (iv) requesting information regarding San Marco's and Gass's efforts to enforce the various rights granted to Plaintiffs, and thus potential buyers of the Gaming Assets, under the Deed, PDA, and  other agreements; (v) demanding that San Marco and Gass take appropriate steps to enforce and protect such rights; (vi) demanding an accounting of gaming revenues and profits, as well as other of Plaintiffs' funds allegedly seized and held by San Marco and Gass or wrongfully diverted by them to the GOL or its counsel; (vii) demanding payment of Plaintiffs' proportionate share of gaming revenues; and (viii) demanding that San Marco and Gass protect various property and other assets belonging to Sanum and remaining in Laos.

39.     Among the specific requests for information and demands that have been made by the Plaintiffs are the following:

- Daily Casino Operating Reports

- Weekly Month-to-Date General Ledger Detail for the Casino

- Monthly Summary Financial Statements, Summary Trial Balance, General Ledger Detail for the Casino

- An accounting of the revenue and income from the Slot Clubs

- An accounting of the cash that San Marco is holding on Plaintiffs' behalf

13

- Documents provided by San Marco to the GOL or the Flat Tax Committee that were used to assist the committee in setting a new flat tax rate for the Gaming assets

- Communications from San Marco to the GOL that point out that the new flat tax of 28% on the Gaming Assets is higher than the tax paid by any other gaming operation in Laos (or the region), and would have a significantly detrimental impact on sale of the Gaming Assets

- Communications from San Marco to the GOL aimed at enforcing the very valuable rights of Plaintiffs, or any purchaser of the Gaming Assets, to expand and upgrade Savannakhet Airport, as provided by Section 25 of the Deed

- Communications from San Marco to the GOL aimed at enforcing the very valuable monopoly on gaming operations provided to Plaintiffs, or any purchaser of the Casino, as provided by the PDA

- Communications from San Marco to the GOL aimed at enforcing the 50-year extension of the 2007 Concession Agreement between the GOL and Sanum, whereby the GOL is to give Sanum – or any purchaser of the Gaming Assets – an additional 50 usable hectares of land to expand gaming operations, as specifically referenced in Section 4(C) of the Contract

- Information regarding San Marco's efforts to coordinate the export from Laos of slot machines then held in storage by the GOL, a right granted to Plaintiffs by Section 21 of the Deed, and a request to prepare the appropriate documentation allowing the export of the machines

- Information regarding San Marco's efforts to safeguard debt instruments that memorialize and secure the debt Sanum granted to the Casino, and to resume payments on that debt

- Information regarding San Marco's efforts to collect, account for, and transmit to Plaintiffs their proportionate share of the net profits from the Gaming Assets

- Status reports regarding San Marco's efforts to secure a suitable buyer for the Gaming Assets, including the identification of potential buyers and how San Marco will evaluate them for suitability

- Information on San Marco's efforts to secure GOL approval for a sale of the Gaming Assets

- A plan for ensuring that the costs for the sale of the Gaming Assets – to be borne by Plaintiffs – are reasonable and appropriate, and that Plaintiffs can approve such costs

- A plan for setting up the escrow account for the proceeds of a sale of the Gaming Assets, as required by Section 15 of the Deed, and for ensuring that such funds are deposited in that account

- A default notice pursuant to the failure of the Casino to make payments due under the Credit Facility Agreements it has with Sanum

- Information regarding San Marco's efforts to attract new business to the Casino and Slot Clubs

- A demand that San Marco secure original title deeds and other land ownership records concerning property owned by Sanum or Savan Vegas in Laos, all of which are located in a safe in the Casino's executive offices

40.     Neither San Marco nor Gass has directly responded to *any* of these requests, and only a trickle of the requested information has been provided.  Instead, the GOL and San Marco's legal counsel sent letters to Plaintiffs demanding that they cease all communications with Gass and San Marco and threatening legal action if they did not.  In doing so, the GOL and Gass, expressly and implicitly took the perplexing position that: (i) despite the express language of the Deed, the Contract, and the SIAC Arbitration panel's Order of June 2015, San Marco and Gass owe no fiduciary obligations to Plaintiffs and need not provide any of the requested information or demands; and (ii) parties are not permitted to communicate directly with their fiduciaries about the very matters in which fiduciary duties are owed.

**2.     Helping the GOL Wrongfully Seize the Casino**

41.     Section 12 of the Deed expressly states that Sanum was to remain in control of the Casino through the Sale, and if the sale was not completed by that date the parties would *jointly* appoint a qualified gaming operator to take over the management, control, and sale of the all of the Gaming Assets until a sale actually occurred.  The GOL breached this provision.

42.     On April 16, 2015, the GOL sent a letter to Plaintiffs declaring that "the Government of the Lao People's Democratic Republic today assumes control and management of the Savan Vegas and Casino Co., Ltd. in Savannakhet, Laos. . . . The Government will soon

15

have its operators enter the Casino and start their management functions. The Government's designated managers will have full authority over all personnel matters and all financial matters."

43. On April 21, 2015, Savan Vegas' CFO, Crawford, and General Manager, Mike Gore ("Gore"), were asked to attend a meeting the following day with the "Sanum Committee" of the GOL, to introduce the "new senior management team to whom the GOL has delegated the task of managing and controlling the operations of the Gaming Assets." Both Crawford and Gore were informed that they were to "work under the guidance and instruction of the new team" – *i.e.* San Marco and Gass – to whom they would "direct[ly] report[]."

44. According to the GOL, the "physical change in control" of the Casino occurred on April 22, 2015. Later that day, Sanum was asked to sign several letters that had been prepared for it, including a letter to the Ministry of Planning and Investment informing it that the Board of Directors of Savan Vegas had changed, and that it would now consist of "Ms. Kelly Gass, the new CEO of the Company; Mr. Travis Miller ("Miller"), the new COO of the Company; and Mr. James Kochel ("Kochel"), the new CFO of the Company." Of course Savan Vegas, a legal entity 80% owned by Sanum, never authorized the employment of these officers, much less made them directors.

45. Mr. Miller, chosen by San Marco and Gass to be the new COO, had no credentials whatsoever for the job. He was apparently a friend of Gass and her bartender. Kochel had never been a CFO, had no casino experience and had been fired for theft by an affiliate of Plaintiffs. Kochel had sworn revenge against the principals of Plaintiffs – hardly someone to select to assist in fulfilling fiduciary duties to Plaintiffs.

46. During the April 22, 2015, seizure of the Casino, the GOL also demanded that Savan Vegas employees sign letters addressed to the Casino's banks to change the signatories on

16

its bank accounts.  The letters stated that the change was due to the fact that "the Board of Directors of the Company ha[d] agreed" to do so, notwithstanding the fact that the Board had given no such instruction.

47.   Nevertheless, the memo was sent on April 23, 2015, and on that same date the Ministry confirmed the removal of John Baldwin and the installation of Gass and Miller as directors of Savan Vegas.  Then, on April 29, 2015, Gass directed that Crawford be fired as CFO of Savan Vegas and the Casino (although the Deed required him to be retained) in order to make room for Kochel, who had already been named CFO.  Removing a knowledgeable CFO with a connection to Plaintiffs was geared to make it easier for Savan Vegas and the Casino to be looted.

48.   These wrongful actions were done by, or with the knowledge and assistance of, Gass and San Marco.

### 3.   Allowing the GOL to Improperly Terminate the PDA

49.   Section 6 of the Deed states that the PDA between Plaintiffs and the GOL governing the development and operation of the Casino, as well as the gaming licenses for the Slot Clubs, shall be "treat[ed] . . . as being restated as of the Effective Date [of the Deed], with a term in each case of fifty (50) years as from the Effective Date."  Extension of the PDA for 50 years with all of its rights and benefits intact was, and is, critical to achieving maximum value in the sale of the Gaming Assets because, among other things, it grants a three province gaming monopoly to Savan Vegas.

50.   Gass was in charge when this action was taken that had an extremely detrimental effect on plaintiffs – but she did nothing, despite repeated requests from Plaintiffs.

4. **Going Along with the Implementation of a Deliberately Confiscatory Tax Rate on the Gaming Assets**

51.     The Deed at Section 9 states that all taxes on the Gaming Assets will be forgiven up to July 1, 2014, and then lays out a procedure whereby the parties' representatives are to jointly form a Flat Tax Committee that is to set a new flat tax – *i.e.* not an *ad valorem* tax rate – on the Gaming Assets, and fixes the amount at which such flat tax would increase every five years.

52.     The GOL, in breach of the Deed, unilaterally appointed an accountant in Macau to set a tax. That accountant then set a percentage tax – not a flat yearly amount as required – of 28% on gross gaming revenue. No other gaming facility, indeed no other business entity, in Laos pays that high a tax. Because of the high cost of junket operators needed to bring in gamblers, a casino loses money with a 28% tax on gaming revenues. Thus, the current tax rate makes it impossible to attract a qualified bidder for the Gaming Assets that will pay what the assets are actually worth.

53.     Despite repeated requests from Plaintiffs, however, Gass failed to either prevent or reverse this action. Indeed, Gass never communicated with the Macau accountant. Instead, she and San Marco continued to sit back and take $150,000 a month from Plaintiffs while failing to persuade the GOL to conform the process to the Deed, change the tax, or put Plaintiffs in a position to force the GOL to do so by providing information to them that could have been taken to the SIAC Tribunal supervising the Deed.

5. **Deliberate Exclusion of Plaintiffs from the Sale Process and Failure to Ensure the Sale is Conducted in a Manner that "Maximizes" Proceeds**

54.     Section 12 of the Deed states that any gaming operator appointed to replace Plaintiffs until the sale of the Gaming Assets is completed "shall have a fiduciary duty" to Plaintiffs "as interested parties in the Gaming Assets." Section 13 requires that a sale "shall be

18

completed on a basis that will *maximize* the Sale proceeds" to Plaintiffs and Laos. (emphasis added). In light of these provisions, the SIAC Arbitration panel considering Plaintiffs' request for provisional measures to enforce the Deed noted that "Laos and the gaming operatives it has employed have a fiduciary duty to [Plaintiffs] and must in good faith consider any suggestions and input" of Plaintiffs. It thus ordered Laos (and the person expected to do this was Gass) to provide Plaintiffs with "regular and ongoing information pertaining to the marketing and other efforts being made to sell the casino."

55.     On May 4, 2015, however, the GOL made clear in an email to Plaintiffs' arbitration counsel that Plaintiffs would be entirely excluded from the sale process, stating that, "[T]he effort will not be a joint effort; The Government will adopt a procedure to have a due diligence room, and will create a fair process from (*sic*) accepting bids and evaluating them; the Government hopes to develop this process over the next month or two, depending on events not all in the Government's control; the Government will not allow interested individuals to have access outside of that process nor will it allow Mr. Crawford on the premises." Given that the acts occurred less than a month after she had ostensibly been put in charge of selling the Gaming Assets, they could not have been accomplished without Gass's knowledge, cooperation and approval.

56.     San Marco and Gass have also conducted the marketing and sale of the Gaming Assets in a woefully inadequate, even deliberately reckless and knowingly improper, manner. The Contract at Section 4(b) mandates that Gass and San Marco, upon its execution, "[t]ake all steps necessary to provide effective marketing and sale of the Gaming Assets as a growing concern" to include hiring consultants, establishing a data room, targeting and controlling all communications with prospective purchasers, conducting management presentations, and

40000/0599-13083688v3

negotiating and accepting a purchase bid. Because Gass has refused all direct communication with Plaintiffs, however, they have been unable to confirm that San Marco has done any of these things, other than putting out brief announcements of the sale on PR Newswire with a link to a copy of the Solicitation of Interest. That link, however, is no longer functional.

57.     In the months following her appointment by the GOL as the individual responsible for marketing and selling the Gaming Assets at the "maximum sales price," three interested buyers of the Gaming Assets approached Plaintiffs. When Plaintiffs requested that Gass enter into discussions with those parties, Gass advised that she was not ready to start the sales process. Plaintiffs have also repeatedly advised Gass that any purchaser of the Casino would want to ensure that they – as Plaintiffs do – also control the Slot Clubs, because otherwise the clubs would violate the gaming monopoly granted to the Casino by the GOL. Accordingly, any marketing plan for the sale of the Gaming Assets must ensure that they are being sold as a package, and include projections and a business plan outlining what the future potential of the Slot Clubs are. Gass and San Marco, however, ignored this advice. Indeed, they have mismanaged the Slot Clubs to the point of, apparently, having to close the Lao Bao Slot Club. Worse,  it now appears that the Slot Clubs are not being sold with the Casino at all, utterly breaching the contractually promised monopoly.

58.     In addition, San Marcos and Gass have: (i) failed to implement fair and adequate procedures to identify and vet qualified buyers of the Gaming Assets; (ii) refused to share financial and operating data concerning the assets with potential buyers; (iii) failed to market the Casino with the Slot Clubs and indeed failed to market the Slot Clubs at all; and (iv) failed to cooperate to set up an escrow account where funds from the sale of the assets will be placed. They have also acquiesced in the  GOL's wrongful repudiation of other valuable rights

20

previously granted to Plaintiffs, and memorialized in the Deed and Contract, that would significantly enhance the sale value of the Gaming Assets' to potential buyers, including: (i) the right, pursuant to Section 25 of the Deed, to expand and upgrade Savannakhet Airport to enable a "fly-in" program from China; and (ii) Plaintiffs' entitlement, specifically referenced in Section C of the Contract, to the Land Concession (which would provide an additional 50 hectares of land from the GOL to expand Casino operations) to be extended for 50 years.

59.     Finally, Gass's New York legal counsel has advised Plaintiffs that it is the GOL, and not Gass or San Marco, which is actually controlling the sale.     Yet, according to her counsel, Gass is unwilling –as Plaintiffs have requested – to make this fact public, or to disclose the GOL's control and manipulation to the SIAC Tribunal.   Gass nevertheless continues to accept $150,000 per month of Plaintiffs' funds under the false pretense that she is Plaintiffs' fiduciary, responsible for selling the assets in a manner that maximizes the sale price.

### 6.     Grossly Incompetent Management of the Gaming Assets

60.     Despite the outlandish fees being paid to them, San Marco and Gass have been grossly incompetent managers and operators of the Gaming Assets.   They have run Plaintiffs' business into the ground , which, at the time Sanum was expelled, was extremely successful.

61.     While the nature of the gaming industry is such that income generally varies monthly, a comparison of the year before Gass took over and the year after Gass took over is instructive.   Gass took over a successful operation that generated $23 million in operating cash flows (EBITDA) in 2014 and turned it into an operation that lost on average of $1.6 million per month from May 2015 to January 2016.   The negative impact of Gass's mismanagement was immediate.   While Defendants reported net income of $1.7 million for May 2015 – the first full month that Gass was in charge – after taking into account the accounting anomalies discussed below the actual result for that month was a *loss* over $300,000.

62.     Thus, the total losses suffered by the Gaming Assets under San Marco's tenure as manager and operator may actually be worse than what it is reporting.  As already noted, San Marco and Gass have refused Plaintiffs' request for complete and meaningful financial information concerning the operation of the Gaming Assets.  Instead, the reports that Defendants have submitted are so incomplete and opaque that it is difficult to determine what San Marco and Gass are actually doing with income from the Gaming Assets.  For example, according to the reports submitted to Plaintiffs, in June and September 2015 Defendants post-dated $1.3 million and $1.4 million in operating expenses, respectively, but offer no explanation for these expenses or why they were post-dated.  Then, in October 2015, Defendants reported negative non-operating expenses of $9.4 million, of which $9.3 million was alleged to have been in relation to transferring assets to a new operating company.  That is almost $12 million in adjustments that remain a mystery.

63.     In addition, Defendants' reports contain stated variances for which there is either no explanation given, or the explanation provided is not helpful.  For example, in August 2015 there is a budget to actual variance in legal expenses of $250,000 – amounting to 234% – with the only explanation being that it was for "costs associated to the ongoing legal dispute between shareholders."  In the October 2015 information provided by Defendants, there is a budget to actual variance of $592,000 – or 160% – for "other operating expense" with no explanation provided.  In other instances, Defendants' reports to Plaintiffs completely ignore variances.  For example, in the November 2015 report there is a discussion regarding a $22,000 variance in repairs, but no discussion whatsoever about another much larger variance – this time of $355,000 (or 333%) – in legal expenses. And there is no explanation for the $2 million loan that was taken out against Plaintiff's assets on Gass's watch.

**7.    Misappropriation of Plaintiffs' funds and failure to protect Plaintiffs' valuable property**

64.    In November 2015, Plaintiffs discovered that all of the funds from Plaintiffs' bank accounts in Laos had been withdrawn and sent to Gass.  She never advised Plaintiffs prior to withdrawing these funds, and has since refused to account for them, or even confirm whether they are still in her possession.

65.    In addition, since taking over as manager and operator of the Gaming Assets, Gass has not paid Plaintiff (the 80% owner of the Casino and 60% owner of the Slot Clubs) any portion of the monies that would have been available had money not been siphoned out to pay the GOL's legal bills – and who knows what else given the opacity of the financial information that has been provided.  Nor have she or San Marco provided an adequate and transparent accounting to Plaintiffs of what the net revenues from the Gaming Assets are, and what portion of those revenues are owed to Plaintiffs.

66.    In January 2016, Plaintiffs found out that San Marco, at Gass's explicit direction and without advising or receiving permission from Plaintiffs, borrowed $2 million using the Gaming Assets as collateral.  To date, Gass has refused to account for these funds or state what the money was used for or intended to be used for.  Gass has also refused to confirm: (i) whether or not San Marco has paid the 28% gaming tax to Laos, or has just accrued it; and (ii) whether San Marco has closed the Lao Bao Slot Club.

**G.    The Damage Done**

67.    It is clear that in managing, operating and conducting the sale of the Gaming Assets, both San Marco and Gass are not acting as Plaintiffs' fiduciaries.  Instead, San Marco and Gass are knowingly and intentionally acting exclusively at the behest, and for the benefit, of the GOL.

40000/0599-13083688v3

68.     As a result of Defendants' breaches of fiduciary duties and contractual obligations, Plaintiffs have been left in the dark regarding the management and operation of the Gaming Assets, of which they are the majority owners, and have suffered tens of millions of dollars in lost gaming profits.

## CAUSES OF ACTION

A.    **Count I:  Breach Of Fiduciary Duty**

69.     Plaintiffs hereby incorporate the factual allegations set forth in the prior paragraphs as fully set forth herein.

70.     Pursuant to the Deed and the Contract, San Marco and Gass owe fiduciary duties – including duties of good faith, loyalty, candor and care – to Sanum and Lao Holding with regard to the management, operation, control, marketing and sale of the Gaming Assets, to include making all efforts to obtain the maximum price for the sale of the assets.

71.     San Marco and Gass have breached their fiduciary duties to Plaintiffs by, among other things: (i) acting solely in the best interests of the GOL with regard to the operation and sale of the Gaming Assets; (ii) refusing to provide Plaintiffs with basic financial and operational information concerning the Gaming Assets; (iii) refusing to provide basic information to Plaintiffs about Defendants' efforts to sell the Gaming Assets; (iv) failing to maximize revenue and profits at the Gaming Assets; (v) failing to safeguard Plaintiffs' funds, property and gaming assets in Laos over which Defendants currently have control (or have wrongfully ceded control to the GOL or others); (vi) misappropriating Plaintiffs' funds; (vii) failing to account for, and pay, Plaintiffs their proportionate share of net income from the Gaming Assets; (viii) failing to control, or account to Plaintiffs for, expenses incurred by San Marco to conduct the sale of the Gaming Assets; (ix) failing to cooperate with Plaintiffs in the marketing and sale of the Gaming Assets, or to accept input, guidance or recommendations from Plaintiffs regarding such

24

marketing and sale; and (x) failing to conduct the sale of the Gaming Assets in a manner that will maximize the sale price.

72.     As a direct and proximate result of Defendants' breach(es) of fiduciary duty, Plaintiffs have suffered significant monetary harm in an amount to be finally determined at a trial of this matter, but exceeding $100 million, with prejudgment interest and the reimbursement of Plaintiffs' legal fees and costs.

73.     In addition, a fiduciary that breaches the duties owed to the party that it owes fiduciary obligations to is not entitled to retain, and must forfeit, the fees that it was paid for services wrongfully performed.  Accordingly, Plaintiffs are entitled in equity to disgorge all fees received by San Marco and Gass under the Contract.

74.     Finally, in breaching the fiduciary duties they owed to Plaintiffs, Defendants wantonly, willfully and/or egregiously acted with oppression and malice directed at Plaintiffs, and Plaintiffs are entitled to punitive damages in an amount to be finally determined at a trial this matter.

**B.     Count II:  Breach Of Contract**

75.     Plaintiffs hereby incorporate the factual allegations set forth in the prior paragraphs as fully set forth herein.

76.     The Contract is a valid agreement between Laos and San Marco.

77.     By its express terms, the Contract was intended to benefit Plaintiffs as well as Laos.

78.     The benefits provided to Plaintiffs in the Contract are clear and direct.

79.     San Marco and Gass have breached their contractual duties to Plaintiffs by failing to manage, operate, control, market and conduct the sale of the Gaming Assets to the benefit and best interest of Plaintiffs.

80.     As a direct and proximate result of Defendants' breach(es) of contract, Plaintiffs have suffered significant monetary harm in an amount to be finally determined at a trial of this matter, but exceeding $100 million, with prejudgment interest.

## C.     Count III:  Conversion

81.     Plaintiffs hereby incorporate the factual allegations set forth in the prior paragraphs as fully set forth herein.

82.     Plaintiffs were legal owners, and/or had an immediate superior right of possession, to funds deposited in bank accounts in Laos that were in the name of Sanum, Lao Holdings, and/or their affiliates (the "Bank Funds").

83.     Plaintiffs are also the legal owners, and/or have an immediate superior right of possession, to 80% of the net revenues of the Casino and 60% of the net revenues of the Slot Clubs (the "Gaming Revenues").

84.     San Marco and/or Gass have exercised unlawful dominion over the Bank Funds and Gaming Revenues to the exclusion of Plaintiffs' rights in that property by: (i) wrongfully, and without knowledge or permission of Plaintiffs, seizing the Bank Funds and transferring them to their control, and failing to account for and return such funds despite Plaintiffs' demands to do so; and (ii) retaining the Gaming Revenues, refusing to account to Plaintiffs' for them, and refusing to pay Plaintiffs the Gaming Revenues despite Plaintiffs' demands to do so; and/or (iii) taking $150,000 per month from the Gaming Revenues to market and sell the Gaming Assets in manner that "maximizes" the sale price of the Gaming Assets for Plaintiffs when Defendants' counsel has admitted that it is actually the GOL that is directing and controlling that sale.

85.     As a direct and proximate result of Defendants' wrongful actions, Plaintiffs have been injured in an amount to be finally determined at a trial of this matter, with prejudgment interest.

40000/0599-13083688v3

86.     Defendants' actions in exercising unlawful dominion over the Bank Funds and Gaming Revenues were accomplished by malice or reckless or willful disregard of Plaintiffs' rights, such that Defendants' wrongdoing was intentional, evinced a high degree of moral turpitude, and demonstrated wanton dishonesty.  Accordingly, Plaintiffs are entitled to punitive damages in an amount to be finally determined at a trial of this matter.

## JURY DEMAND

87.     Plaintiffs hereby demand a jury trial.

## REQUEST FOR RELIEF

For all the foregoing reasons, Plaintiffs respectfully request that this Court enter a judgment in Plaintiffs' favor and against Defendants, providing the following relief:

(a)     Judgment against Defendants in Plaintiffs' favor on its claims;

(b)     Judgment against Defendants in the full amount of compensatory damages suffered by Plaintiffs in an amount to be proven at trial;

(c)     Judgment against Defendants for punitive damages in an amount to be proven at trial;

(d)     Equitable forfeiture by Defendants of all fees it received under the Contract and the return of such fees to Plaintiffs;

(e)     Prejudgment and post-judgment interest at the highest lawful rate;

(f)     All attorneys' fees and costs allowed by law; and

(g)     Such further legal and equitable relief as the Court may deem appropriate and to which Plaintiffs may be entitled.

40000/0599-13083688v3

COLE SCHOTZ P.C.

Michael F. Bonkowski (No. 2219)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
(302) 651-2002 (Phone)
(302) 574-2102 (Fax)
mbonkowski@coleschotz.com
nbrannick@coleschotz.com

*Counsel for Plaintiffs,*
*Sanum Investment Limited and*
*Lao Holdings, N.V.*

**OF COUNSEL**

Deborah Deitsch-Perez
Kenneth N. Hickox, Jr.
Lackey Hershman, LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219-4241
Telephone No. (214) 560-2201
Facsimile No. (214) 560-2203
ddp@lhlaw.net
knh@lhlaw.net

Dated:  May 3, 2016